**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

CALEB HUNTER

CRIMINAL CASE NO.

1:14-cr-00089-AT-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION,
## AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Caleb Hunter ("Hunter") is charged in a two-count indictment

with knowingly receiving and possessing one or more visual depictions of minors

engaged in sexually explicit conduct, in violation in 18 U.S.C. §§ 2252(a)(2),

2252(a)(4)(B), 2252(b)(1), and 2252(b)(2). [Doc. 1].[1]  Hunter has moved to suppress

evidence and his statements, [Docs. 14 & 15], and following an evidentiary hearing

held on June 3, 2014, and June 12, 2014,[2] the parties filed post-hearing briefs, [Docs.

---

[1] The listed document and page numbers in citations to the record refer to the
document and page numbers shown on the Adobe file reader linked to the Court's
electronic filing database, CM/ECF.

[2] See [Docs. 21 & 22] for the transcripts of the evidentiary hearing.  Citations
to the first evidentiary hearing transcript, [Doc. 21], hereinafter will be referred to
as "(Doc. 21 at ___)," and citations to the second evidentiary hearing transcript,
[Doc. 22], will be referred to as "(Doc. 22 at ___)."  In addition, the parties submitted
exhibits which will be referred to as "(Gov. Ex. ___)" for the government's exhibits
and "(Def. Ex. ___)" for Hunter's exhibits.

23 & 25]. For the following reasons, it is **RECOMMENDED** that Hunter's motions to suppress evidence and statements, [Docs. 14 & 15], be **DENIED**.

## I. STATEMENT OF FACTS

On the evening of May 16, 2013, Special Agents Anthony Scott ("Agent Scott") and David Westall ("Agent Westall"), of the Department of Homeland Security, went to Hunter's apartment in Marietta, Georgia, to conduct a "knock-and-talk"[3] pertaining to evidence of child pornography that had been linked to Hunter's residence.[4] (Doc. 21 at 3-5; Doc. 22 at 3-5); see also (Doc. 21 at 5, 21, 31; Doc. 22 at 6). The agents wore plain "street clothes" and Agent Westall had a badge on a lanyard around his neck. (Doc. 21 at 6, 26; Doc. 22 at 7). Each agent also carried a concealed firearm. See (Doc. 21 at 6; Doc. 22 at 7). Hunter answered the door and stepped outside to speak with the agents when they arrived, whereupon the agents identified themselves and explained why they were there. (Doc. 21 at 6, 26; Doc. 22 at 6). In particular, the agents asked Hunter if he had a user profile and e-mail

_____

[3] Agent Scott described a "knock-and-talk" as "an investigative tool [agents] use when [they] have information that illegal activity may be going on at the residence but [they] don't have enough evidence to rise to the level of probable cause to get [a] search warrant." (Doc. 21 at 5).

[4] The agents testified that they had previously received information that an individual at Hunter's residence, whom they later determined to be Hunter, might be using an e-mail address and website that were connected with the exchange of child pornography. See (Doc. 21 at 5; Doc. 22 at 4).

address by the name of "X-Ray Guy," which they said had been associated with the use of child pornography. (Doc. 21 at 26, 32; Doc. 22 at 5-6). Hunter admitted that the profile and e-mail address were his, but he denied having any child pornography in his possession. (Doc. 21 at 8-9, 32; Doc. 22 at 6). The agents then asked Hunter if he would like to continue the conversation inside, and Hunter said he would and invited the agents into the apartment. <u>See</u> (Doc. 21 at 8, 17, 26; Doc. 22 at 7).[5]

Upon entering the apartment, the agents reiterated that they "had information that an individual at that location was accessing [a] photo sharing website" associated with child exploitation, and explained that they were looking specifically for images of child pornography in connection with the profile and e-mail address of X-Ray Guy, as well as for any missing or endangered children. (Doc. 21 at 8; Doc. 22 at 11). Agent Westall also asked Hunter if he was alone in the apartment and if

---

[5] While Hunter testified that he only went inside with the agents after Agent Westall told him that "[Hunter] didn't want [his] neighbors to hear and that [they] should move inside," (Doc. 21 at 26), Agent Westall testified that he told Hunter that they could continue to talk outside the apartment, but that "if [Hunter] want[ed] to go inside, [they would] go inside," to which Hunter replied that he would prefer to talk inside the apartment, (Doc. 22 at 7); <u>see also</u> (<u>id.</u> (Agent Westall told Hunter it was "up to [him]")). Similarly, Agent Scott testified that Hunter "invited" the agents inside, (Doc. 21 at 8), and that although it was Agent Scott's "typical practice to ask individuals if they would prefer to go inside so the neighbors don't hear," he never told Hunter "that it would be better to go inside so the neighbors wouldn't hear," (<u>id.</u> at 17).

he would allow Agent Westall to look around and see if anybody else was there. (Doc. 21 at 18; Doc. 22 at 8).  Hunter said he was alone and that Agent Westall could take a look around.  (Doc. 22 at 8).  Agent Westall then looked through the apartment for about thirty seconds while calling out the name "Anna."[6]  (Doc. 21 at 26; Doc. 22 at 8-9, 11).

Once Agent Westall confirmed that no one else was inside, the agents presented Hunter with an Immigration and Customs Enforcement ("ICE") consent-to-search form, (Gov. Ex. 1), which Agent Scott had carried with him into the apartment when they first arrived, and asked Hunter for his permission to search his computer for child exploitation material, (Doc. 21 at 9, 23; Doc. 22 at 9, 12-13, 21, 26).[7]  The agents testified that Hunter gave them permission to search the computer and that he reviewed and signed the consent-to-search form, which Agent

_____

[6] Agent Westall explained at the evidentiary hearing that several child exploitation videos involve a missing girl named Anna, and so the agents would often "seek out Anna" when investigating child pornography.  (Doc. 22 at 11).

[7] Although Hunter testified that the agents "didn't have any papers with them when [they] came up originally," (Doc. 21 at 42), Agent Westall testified that he had a "portfolio" while Agent Scott had a computer bag, with the consent-to-search form inside, when the agents first arrived, (Doc. 22 at 21, 26).

Westall also read aloud.  (Doc. 21 at 9-10; Doc. 22 at 12-13).  The completed form reads, in relevant part:

> I, Caleb Hunter, have been informed by U.S. Immigration and Customs Enforcement (ICE) Special Agent David Westall of my right to refuse to consent to a search of my property, described as . . . Computer devices[.]  I have also been advised by [Agent Westall] that, if I voluntarily consent to a search of this property, anything discovered during this search may be used against me in any criminal, civil, or administrative proceedings.  I have decided to allow [Agents Westall and Scott] to conduct a complete search of my Computers, located at 2010 Roswell Rd Apt 22C2 in Marietta, GA. These . . . Agents are authorized by me to take any materials[] or other property which they may desire to examine.

(Gov. Ex. 1).  At the bottom of the form there is a box containing the following text:

> I hereby voluntarily and intentionally consent to allow ICE to search my property.  My consent is freely given and not the result of any promises, threats, coercion, or other intimidation.  I have read the above statement and understand my rights.

(Id.).  Hunter's name appears printed and signed inside the box immediately beneath this language, and both agents testified that they witnessed Hunter sign the form.  See (id.; Doc. 21 at 9-10; Doc. 22 at 13).[8]  Agent Westall estimated that Hunter consented to the search within five minutes of the agents' initial arrival.  (Doc. 22 at 14).

---

[8] Agent Westall also signed the form as a witness.  See (Gov. Ex. 2; Doc. 22 at 13).

After Hunter signed the consent form, Agent Scott inserted a "USB stick" into the computer and began running a program called "O.S. Triage Forensic Preview Tool," which operates by retrieving images from the computer which law enforcement may then review. (Doc. 21 at 10, 18-19, 23-24; Doc. 22 at 14).[9] As the program brought up different folders from within the computer, Hunter stood behind Agent Scott and directed him concerning which folders Agent Scott could search and which he could not search. (Doc. 21 at 11, 20; Doc. 22 at 14); see also (Doc. 21 at 11 (Agent Scott specifying that Hunter "direct[ed] [him] to where [] some downloads might be of just regular pornography")).[10] According to Agent Westall, Agent Scott opened and searched the folders in accordance with Hunter's directions for close to an hour, until "one of the folders that [] Hunter told [the agents] that [they] could look in contained images of a young child being sexually assaulted."

---

[9] Contrary to the agents' testimony, Hunter testified that he signed the consent form only after the agents had already completed the search without his prior consent. See (Doc. 21 at 26-27, 31). As the timing of Hunter's consent to the search is critical to the Court's determination of whether that consent was valid, the Court will discuss the conflicting testimony on this point in greater detail in the discussion of the motion to suppress evidence.

[10] Agent Scott explained that the triage program allows the user to review images and videos while the program is still operating and collecting additional data. (Doc. 21 at 19).

(Doc. 22 at 15).[11]  Agent Westall testified that when the agents then asked Hunter about these images, Hunter said "he had been lying to [the agents] the whole time and that . . . there were large amounts of . . . child pornography" stored elsewhere on the computer.  (Id. at 15-16).[12]

Once the images had been located, Hunter agreed to allow Agent Westall to conduct a recorded interview with him, and Agent Westall went to his car to retrieve a recording device.  (Id. at 16).[13]  The interview took place in the corner of a large living room area in the apartment that was adjacent to the doorway.  (Doc. 21 at 13). Agent Scott was situated at the computer, while Agent Westall sat on a table in front of Hunter, who was seated with his back to the door and with unrestricted access to the doorway.  (Id. at 13-14, 28-29; Gov. Ex. 2).  At the outset of the interview, the agents told Hunter that he was "not under arrest" and was "not going to jail," and

---

[11] Hunter indicated at the evidentiary hearing that the agents only discovered child pornography on the computer when Agent Westall instructed Agent Scott to open a folder that Hunter did not direct Agent Scott to open.  See (Doc. 21 at 28). Agent Westall specifically testified, however, that Agent Scott looked only in those folders which Hunter directed him to open.  (Doc. 22 at 14).

[12] Agent Westall further testified that Hunter gave the agents permission at that point to search for the remaining child pornography stored on the computer, which they did, and that the search uncovered additional images of child pornography.  (Doc. 22 at 16).

[13] Both Agents testified that nothing had been recorded prior to this point in their encounter with Hunter.  (Doc. 21 at 11-12; Doc. 22 at 16).

that he was free to refuse to answer any of the agents' questions. (Gov. Ex. 2). The agents then asked Hunter if he understood these things, and Hunter answered, "Yes." (Id.). Hunter acknowledged on several occasions during the interview that nobody had threatened him and that he was "helping of [his] own volition," and he also confirmed that "nobody ha[d] drawn a gun" and that he had "freely and willingly" allowed the agents to search his computer. (Id.). The entire interview lasted about thirty minutes. (Id.; Doc. 22 at 17).

At the conclusion of the interview, Agent Westall told Hunter that the agents had to seize the computer because it contained child exploitation material, and he presented Hunter with a form entitled "Department of Homeland Security Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise." (Gov. Ex. 3). Agent Westall testified that he explained to Hunter that Hunter could complete the form to abandon his ownership of the computer if he wished, but that he also had "the option" of petitioning administratively to recover the computer after it had been seized. (Doc. 22 at 18). Hunter elected to abandon the computer, and he signed the form in the presence of both agents, affirming that he "abandon[ed] all claims" and "waive[d] any further rights or proceedings" with respect to the property to be seized, which was described in the form as an "HP Desktop Computer" with an identifying serial number. (Id. at 19; Gov. Ex. 3). After

Hunter had completed the abandonment form, the agents seized the computer and left the premises.  <u>See</u> (Doc. 21 at 16, 22); <u>see also</u> (Doc. 22 at 18-19 (Agent Westall testifying that Hunter signed the abandonment form at "the very end" of his encounter with the agents, "right before [the agents] were leaving")).  Agent Westall testified that, from the time the agents entered the residence, their "entire interaction" with Hunter, including the interview and the search of the computer, lasted for a total of "several hours" and occurred in the living room area of the apartment.  (Doc. 22 at 16, 19, 25); <u>see also</u> (Doc. 21 at 16, 29).

## II.  DISCUSSION

Hunter moves to suppress the statements he made on May 16, 2013, [Doc. 15], as well as the evidence seized during the search of his residence that same date, [Doc. 14].  The government asserts that the evidence and statements were lawfully obtained and are therefore admissible.  [Doc. 23].  The Court will consider each of the pending motions and the parties' arguments in turn.

## A.  <u>Motion to Suppress Evidence</u>

Hunter argues that the evidence seized from his residence pursuant to the search of May 16, 2013, must be suppressed because his consent to the search was not valid.  [Doc. 25 at 8-12].  In particular, Hunter contends that he did not effectively consent to the search of his computer because he signed the consent-to-

search form only after the agents had already searched the computer without his permission.  [Id. at 10-12].  He further argues that, even if he did consent to the search of the computer, the evidence must nonetheless be suppressed because the consent was not voluntary, and because the search exceeded the scope of his consent.  [Id. at 10-11].  The government responds that the evidence seized in this case is admissible because "[t]he totality of the circumstances show that [Hunter] voluntarily consented to the search of his computer."  [Doc. 23 at 16].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  Consequently, "a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location."  United States v. Cruz, Criminal Action No. 1:11–CR–0377–WSD–CCH, 2012 WL 1564671, at *5 (N.D. Ga. Mar. 19, 2012), adopted by 2012 WL 1564667, at *3 (N.D. Ga. Apr. 30, 2012) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989); Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  Warrantless "searches and seizures inside a home . . . are presumptively unreasonable," United States v. Bervaldi, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing Payton v. New York, 445 U.S. 573, 586, 603 (1980)), subject only to "a few specifically established and well-

delineated exceptions," <u>Mincey</u>, 437 U.S. at 390 (<u>quoting</u> <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  "Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement." <u>Cruz</u>, 2012 WL 1564671, at *5 (<u>citing</u> <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961)).  Since a warrantless search or seizure is presumptively invalid, the government bears the burden of establishing by a preponderance of the evidence that a particular exception to the warrant requirement applies.  <u>Michigan v. Tyler</u>, 436 U.S. 499, 509 (1978); <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1970).

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted).  <u>See also</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1971); <u>United States v. Reynolds</u>, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." <u>Garcia</u>, 890 F.2d at 360 (citation omitted).  The government bears the burden of proving that consent was voluntary, <u>United States v. Tovar-Rico</u>, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, <u>Schneckloth</u>, 412 U.S. at 227; <u>Reynolds</u>, 526 F.

Supp. 2d at 1337.  Relevant factors include whether the consenting party was free to leave or refuse consent, the existence of coercive police procedures, the extent of the consenting party's cooperation or awareness of a right to refuse consent, the consenting party's education and intelligence, and the consenting party's belief that no incriminating evidence would be found.  United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002); United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).

After careful consideration of the testimony and evidence presented at the evidentiary hearing in this case, the Court finds that Hunter voluntarily consented to the search of his computer.  First, the Court rejects Hunter's argument that his consent was ineffective based on his testimony that he only signed the consent form after the search had already occurred, see [Doc. 25 at 10-12], as Hunter's testimony on this point is unclear and inconsistent, and also conflicts with the more credible testimony of Agents Scott and Westall as well as the other evidence of record.  See United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (noting that credibility assessment is within the province of the factfinder).  According to Hunter, after Agent Westall finished looking through the house, Agent Scott told Hunter that he was going to use a USB stick to search his computer and that he did not need Hunter's help.  See (Doc. 21 at 26-27); see also (id. at 31 (Hunter testifying that the

agents told him "they had to search [his] computer," and that he did not believe he could "agree or disagree," but that "it was just going to happen")). The agents consistently testified, however, that they obtained Hunter's consent before they began the search, and they expressly denied telling Hunter that they could search the computer even without his consent. (Doc. 21 at 18-19; Doc. 22 at 12-14, 22); see also (Doc. 21 at 21-22 (When asked if he told Hunter that he could search his computer without his consent, Agent Scott replied, "No. I have never done that.")). See also United States v. Weeks, 666 F. Supp. 2d 1354, 1372 (N.D. Ga. 2009), adopted at 1358 (footnote, citations, and internal marks omitted) (finding testimony at evidentiary hearing "not credible" where it was inconsisten[t] . . . with that of [] three law enforcement agents").

Moreover, Hunter's testimony is not reliable because he appears to have conflated the consent-to-search form with the abandonment form. For instance, Hunter specifically testified that he recalled signing only one form—the consent-to-search form—yet when counsel for the government showed him the abandonment form at the hearing, Hunter admitted that the signature on that form was his. (Doc. 21 at 38); see also (Gov. Ex. 3; Doc. 22 at 19). Hunter then surmised that he had "probably" signed the abandonment form at the same time as the consent form, which he said Agent Westall had retrieved from the car after the images had been

found on his computer.  (Doc. 21 at 38).  Agent Scott credibly testified, however, that the forms were not presented at the same time, explaining that it was his "practice" when conducting "forensic previews" first to obtain written consent to search, and then later—only when the ensuing search reveals contraband, such that "the device has to be taken off the premises"—to present the owner of the device with an abandonment form, which is "always" "one of the last things [the agents] do before [they] leave a residence."[14] (Id. at 43); see also (id. at 18-19, 43 (Agent Scott testifying that he searched the computer after Hunter signed the consent form, "shortly after" the agents' initial arrival)).  Similarly, Agent Westall testified that he did not retrieve the consent form from the car, but only the abandonment form, as Agent Scott already had the consent form with him from the time the agents first arrived.  (Doc. 22 at 21, 26); see also (id. (Agent Westall testifying that "Agent Scott keeps [the consent] form in his computer bag," which he had with him when the agents first entered the residence, "as part of the overall packet that [the agents] have when [they] ask someone for consent to search their computer")).  And significantly, Hunter also testified that his "understanding of [the consent-to-search] form was that [he] was abandoning the computer," when in fact the consent form states only

---

[14] Agent Scott also confirmed that nothing led him to believe that he did not follow this "practice" during his encounter with Hunter on May 16, 2013.  (Doc. 21 at 44).

that Hunter would "allow [the agents] to search" the computer and makes no mention of abandonment. (Id. at 31). Cf. (Gov. Ex. 3 (abandonment form expressly providing that Hunter "abandon[ed] all claims" to the computer)).

Nor did Hunter convincingly explain why, if the agents had searched his computer without his consent, he nevertheless signed the consent-to-search form—in which he expressly acknowledged that he had been informed of his "right to refuse to consent" to the search, see (Gov. Ex. 1)—instead testifying simply that his signing of the form "didn't matter" since "[the computer] had already been searched," (Doc. 21 at 34-5). Thus, having observed and considered the testimony and demeanor of the witnesses, as well as all the exhibits admitted at the hearing, "the Court credits the testimony of [Agents Scott and Westall] where it conflicts with [Hunter]'s testimony as it relates to the events [surrounding the agents' encounter with Hunter] that occurred on May [16], 2013." United States v. Sifuentes-Botello, No. 2:13–cr–90–FtM–38CM, 2014 WL 348547, at *8 (M.D. Fla. Jan. 31, 2014), adopted at *1 (footnote omitted). In making this determination, the Court has considered the "totality of the evidence presented," including "the identity, training, age, experience, demeanor, and respective interests of the witnesses in the outcome of the proceedings." United States v. Partin, Criminal Action No. 2:12cr188–MHT, 2013

15

WL 6388592, at *1 n.1 (M.D. Ala. Dec. 6, 2013), adopted at *1.[15]   See also

Sifuentes-Botello, 2014 WL 348547, at *8 (crediting officer's testimony where he

"consistently and confidently testified" and where other "evidence tend[ed] to

support [the] testimony"); United States v. Vangasbeck, No. 6:12–cr–158–Orl–37TBS,

2012 WL 4478982, at *2 (M.D. Fla. Sept. 28, 2012) (finding agents' testimony "credible

based on the agents' demeanor and recall of the events of the interview under direct

and cross-examination").

Hunter also argues that, even if he did consent to the search of the computer

before the images were found, his consent was not voluntary because the agents

allegedly told him that "they needed to look on [his] computer to help Anna," (Doc.

21 at 26), and "based on his prior experience, he did not feel there was anything he

could do when law enforcement officers were actively looking for someone," [Doc.

25 at 10-11].[16]   Agent Westall credibly testified, however, that the agents did not tell

---

[15] Additionally, the Court has taken into account "the factors listed in Basic Instruction 5 of the Eleventh Circuit Pattern Criminal Jury Instructions, i.e., (1) whether the witness had any particular reason not to tell the truth, (2) whether the witness had a personal interest in the case, (3) whether the witness seemed to have a good memory, (4) whether the witness had the opportunity to accurately observe the things testified about, (5) whether the witness understood the questions clearly, and (6) whether the witness's testimony differed from other testimony or evidence." Sifuentes-Botello, 2014 WL 348547, at *8 n.3.

[16] Specifically, Hunter testified that at some point in 2008 he woke up to find a police officer searching his room in response to a 911 call from the room's previous renter, whose call had been incorrectly traced to Hunter's residence. (Doc. 21 at 39-

Hunter that they needed to search the computer to find Anna,[17] (Doc. 22 at 22), and, more importantly, "while [Hunter] argues that he felt he had no choice but to consent . . ., the record does not support a finding that the [agents] in any way expressed or implied that he had no choice but to consent." United States v. Henry, Criminal Action File No. 1:10–CR–521–TCB–AJB–02, 2013 WL 3467141, at *5 (N.D. Ga. June 6, 2013), adopted in relevant part by 2013 WL 3475185, at *2 (N.D. Ga. July 10, 2013) (footnote omitted).  To the contrary, Hunter expressly acknowledged, in signing the consent-to-search form, that his consent was "freely given and not the result of any promises, threats, coercion, or other intimidation" by the agents, (Gov. Ex. 1); see also (Doc. 21 at 30 (Hunter testifying at the evidentiary hearing that the agents did not "physically threaten[]" him"), and he likewise affirmed that he had read the form and "underst[ood] [the] rights" described therein, including the "right to refuse consent," (Gov. Ex. 1).  Both agents witnessed Hunter review and sign the

---

40).  Hunter related that the officer entered his room without his consent and told him that once the police "are looking for someone . . ., there really [was not] anything [he could] do to stop them[.]"  (Id. at 40).  Hunter thus claimed that he was "under the impression that [he] could not refuse [the search of the computer] because [the agents] were actively trying to help somebody [(Anna)] who was in danger."  (Id. at 27); see also (id. at 26).

[17]  To the extent Hunter argues that Agent Westall's reference to Anna was police deception that rendered his consent to the search involuntary, this argument is rejected for the reasons discussed hereinafter regarding the voluntariness of his confession.

consent form, which was also read aloud to him, and Hunter testified at the evidentiary hearing that he understood the form's plain language and that he had completed one year of college. (Doc. 21 at 9-10, 33-35; Doc. 22 at 12-13). Similarly, during the recorded interview, Hunter specifically acknowledged that nobody had threatened him, that he was "helping of [his] own volition," and that he had "freely and willingly" allowed the agents to search his computer. (Gov. Ex. 2).

At no point during his encounter with the agents did Hunter say he did not want the agents to search the computer or otherwise indicate that he wanted to withdraw his consent to search, see (Doc. 22 at 13, 17), nor did he indicate at any time that he wanted the agents to leave, (Doc. 21 at 15; Doc. 22 at 10). The agents consistently testified that Hunter was "very cooperative" throughout the entire investigation, (Doc. 21 at 15; Doc. 22 at 17), and Hunter even assisted in the search by directing Agent Scott to open certain folders where the agents might find "the images [] they were looking for," (Doc. 21 at 11, 20, 27-28; Doc. 22 at 14). At no point did the agents draw or display their weapons, (Doc. 21 at 7; Doc. 22 at 8; Gov. Ex. 2), and both agents testified that Hunter did not appear to be suffering from any mental impairments or to be under the influence of drugs or alcohol, (Doc. 21 at 15; Doc. 22 at 20-21). Finally, Hunter consented to the search within just minutes of the agents' arrival, in the familiar surroundings of his own home, (Doc. 22 at 14, 16, 19, 25); see also (Doc. 21 at 16, 29), and he was not arrested, handcuffed, or restrained

in any way, (Doc. 21 at 12-13; Doc. 22 at 19), but was "free to move around" at will, (Doc. 21 at 15); see also (Doc. 22 at 20).

Thus, notwithstanding Hunter's "impression that [he] could not refuse" the search, (Doc. 21 at 27); see also (id. at 26), consent has been found voluntary in circumstances far more coercive than those presented here, especially since Hunter was not under arrest or threatened with arrest when he consented to the search, see, e.g., United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (consent held voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (consent was voluntary despite officers' refusal to accept suspect's conditional consent to search as well as threats to obtain a search warrant if the suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if consent were refused, they would return and "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (consent found voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn.  See also United States v. Scott, 517 F. App'x 647, 650 (11th Cir. 2013) (per curiam) (unpublished) (although defendant initially refused consent to a search of

19

his home and eventually consented only while handcuffed and under arrest, consent was voluntary because it was "not obtained by coercive or deceptive [police] conduct"); United States v. Barsoum, No. 8:11–cr–548–T–33MAP, 2012 WL 1405699, at *1-3 (M.D. Fla. Apr. 5, 2012), adopted by 2012 WL 1405679, at *1 (M.D. Fla. Apr. 23, 2012) (finding that defendant "freely consented" to the search of his home, where agents pounded on his front door at 6:00a.m., pulled him out of his house and handcuffed and shackled him, and then conducted an unlawful sweep of his residence with his family inside, all the while with their weapons drawn and under "[c]ircumstances [that] were purposely intimidating").

Equally without merit is Hunter's contention that the search "exceeded the scope of [his] consent," [Doc. 25 at 11]; see also [id. (citation omitted) (arguing that "the agents intentionally went beyond the scope of any consent [] Hunter may have given them by searching a folder that he did not authorize")], since that argument is based solely on Hunter's unconvincing testimony about the circumstances surrounding the consent to search, which the Court has already discounted for the reasons discussed earlier. Agent Westall's testimony about the search, by contrast, was confident, coherent, and consistent with the other evidence of record, and Agent Westall specifically testified that Agent Scott's search of the computer was limited to those folders which Hunter had first instructed him to open. (Doc. 22 at 14-15

20

(affirming that Agent Scott "compl[ied]" with Hunter's instructions, "telling him .
. . to look here, don't look there")).[18] See also (Gov. Ex. 1 (emphasis added) (consent-
to-search form providing that Hunter "allow[ed the agents] to conduct a *complete*
search of [his] [c]omputer[]")); Weeks, 666 F. Supp. 2d at 1372 (citation omitted)
(rejecting defendant's "unsubstantiated claim" in support of motion to suppress
evidence, where claim was "not supported by the credible testimony presented at
the evidentiary hearing").

In sum, "while [Hunter's] subjective beliefs are relevant to the totality of the
circumstances to be considered, the critical issue still is official coercion," and
"[t]here was none in this case." Henry, 2013 WL 3467141, at *5 (citations omitted)
(citing Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003)); see also id.
(defendant's consent to search held voluntary where, even though "[defendant]
might have thought he had no choice to consent, he was not coerced by the agents

---

[18] The Court is mindful of Agent Scott's vague recollection, at the evidentiary
hearing, that he found the images of child pornography "without [Hunter's]
assistance," (Doc. 21 at 11); however, Hunter does not rely on this testimony in
support of his contention that the search exceeded the scope of his consent, and in
any event, neither agent testified that Agent Scott failed to comply with any of
Hunter's directions, and Agent Westall in fact credibly testified to precisely the
opposite, see generally (Docs. 21 & 21); see also (Doc. 22 at 14-15), nor has Hunter
pointed to any credible evidence of record to support his singular account of the
scope of the search in relation to his instructions.  Moreover, the consent form
Hunter signed authorized a "complete search" of the computer, see (Gov. Ex. 1), and
there is no evidence that he ever revoked that consent.

to consent").  Based on the facts and circumstances presented in the record, the Court thus finds that Hunter voluntarily consented to the search of his computer, and that his consent was therefore "the product of an essentially free and unconstrained choice."  Garcia, 890 F.2d at 360.  Accordingly, the evidence in this case was not obtained in violation of Hunter's Fourth Amendment rights, and it is therefore **RECOMMENDED** that Hunter's motion to suppress evidence, [Doc. 14], be denied.

B.   **Motion to Suppress Statements**

Hunter argues that the statements he made to the agents on May 16, 2013, were involuntary, and are therefore inadmissible, because: (1) he "believed that the agents came to his residence . . . to help Anna, [] who was in danger," but he "did not understand that the agents were looking for child pornography," [Doc. 25 at 7-8]; (2) he did "not believe he had any choice" to make a statement "because of his prior experience with law enforcement," [id. at 8]; and (3) the agents never advised him that he had a right to counsel or that his statements could be used against him, [id.].[19]  Whether a statement was voluntarily given must be examined in light of the

---

[19]  Although the agents did not read Hunter his Miranda rights prior to questioning, see (Doc. 21 at 14); Miranda v. Arizona, 384 U.S. 436 (1966), Hunter concedes, in his post-hearing brief, that his statements were not obtained in violation of Miranda because he was not in custody when the statements were made, see [Doc. 25 at 5 n.2 ("Based on the evidence presented at the hearing, [] Hunter was not in custody when he was questioned and therefore not entitled to *Miranda* warnings. Therefore, this issue will not be addressed.")].

totality of the circumstances. United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth, 412 U.S. at 226; Hubbard, 317 F.3d at 1252). "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted). "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Id. (citations omitted).

The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345. Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of

coercive police conduct.'"   United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Another "factor to consider among the totality of the circumstances in determining voluntariness'" is whether the police employ deceptive tactics to elicit a confession.  United States v. Graham, Criminal Action File No. 3:13–cr–11–TCB, 2014 WL 2922388, at *9 (N.D. Ga. June 27, 2014), adopted at *1 (quoting Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992) (citing Frazier v. Cupp, 394 U.S. 731, 739 (1969)).  However, "'[c]ourts have been reluctant to deem trickery by the police a basis for excluding a confession on the ground that the tricks made the confession

coerced and thus involuntary.'" Id. (quoting Aleman v. Vill. of Hanover Park, 662

F.3d 897, 906 (7th Cir. 2011)). Rather, courts have held that "trickery or deceit is only

prohibited to the extent it deprives the suspect of knowledge essential to his ability

to understand the nature of his rights and the consequences of abandoning them."

Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (internal marks omitted) (quoting

Moran, 475 U.S. at 424). Thus, "[t]he kinds of deception that are generally deemed

to trigger suppression are lies about a defendant's legal rights (i.e., 'you must answer

our questions'), false promises (i.e., 'whatever you say will be just between us'), or

threats (i.e., 'if you don't talk, you won't see your family for a very long time')."

United States v. La Forgia, Criminal No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D.

Ala. May 22, 2012) (footnote omitted) (citing United States v. Degaule, 797 F. Supp.

2d 1332, 1380 (N.D. Ga. 2011), adopted at 1344); see also United States v. Lall, 607

F.3d 1277, 1285-86 (11th Cir. 2010) (citations omitted) (noting that police

misrepresentations of fact are not enough to render a confession involuntary, but

misrepresentations of law are more likely to do so); Aleman, 662 F.3d at 906 ("The

confession must be excluded only if the government feeds the defendant false

information that seriously distorts his choice, [for example] by promising him that

if he confesses he will be set free—in other words, only if the false statement

destroyed the information that he required for a rational choice."); United States v.

Rogers, 906 F.2d 189, 191-92 (5th Cir. 1990) (confession not voluntary where police "assured [defendant] that he would not be arrested if he cooperated with them").

Additionally, the law in the Eleventh Circuit "is clear, that the police's use of a trick alone will not render a confession involuntary," unless there are "other aggravating circumstances" beyond the mere use of deceptive tactics, United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) (emphasis added) (citations omitted); see also Frazier, 394 U.S. at 739 (observing that misrepresentations by the police are "insufficient [by themselves] to make [an] otherwise voluntary confession inadmissible"); United States v. Middleton, 245 F. App'x 867, 872 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted) (noting that the "single interrogation trick" of lying about the evidence against a defendant, "in the absence of any other aggravating circumstances suggesting coercion on the part of [the police,] does not automatically render [the statement] involuntary"). Indeed, "[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made." Moore v. Hopper, 389 F. Supp. 931, 934 (M.D. Ga. 1974) (citations omitted)); see also United States v. Blue, 122 F. App'x 427, 430 (10th Cir. 2005) (unpublished) (citations omitted) ("Without more,

26

. . . misrepresentations, ruses, and trickery by questioning authorities do not render a voluntary confession involuntary.").

Under the totality of the circumstances in this case, the Court concludes that Hunter's statements to the agents on May 16, 2013, were made voluntarily. First, contrary to Hunter's contention that he believed that the agents came to his apartment only "to help Anna," but "did not understand that [they] were looking for child pornography," [Doc. 25 at 7-8], the agents made it abundantly clear that they had come to speak with Hunter about "matters [pertaining to] child exploitation images" and that they were looking for images of child pornography in connection with a username and e-mail address that Hunter identified as his own, (Doc. 21 at 5-6, 8-9, 26, 32; Doc. 22 at 5-6, 11). The agents also specifically asked Hunter for permission to search his computer "for child exploitation material," and they asked him to make a recorded statement only after the images of child pornography were eventually found. (Doc. 21 at 9, 23; Doc. 22 at 9, 12-13, 15-16, 21, 26). Moreover, there is no mention of "Anna" during the recorded interview, which centers around the use and possession of child pornography. See (Gov. Ex. 2).

To the extent Hunter argues Agent Westall's reference to Anna constituted police deception that rendered his confession involuntary, see [Doc. 25 at 7-8 (citations omitted)], the record does not support a finding that either of the agents

used deceptive tactics in this case.  Specifically, when asked at the evidentiary hearing to explain why he "called out the name Anna" when looking through Hunter's residence, Agent Westall testified that "there are several different child exploitation videos where there is a missing child[ named] Anna, and so oftentimes when [the agents] do knock-and-talks [they] seek out Anna," adding that there have been occasions in the past when the agents "ha[ve] done . . . knock-and-talks where the victim of child exploitation is there in the house." (Doc. 22 at 11).  Agent Westall further testified that he "explain[ed] to Hunter why [he was] calling out for Anna" by telling him that, "in addition to the images that are associated with the X-Ray Guy email address, . . . [the agents were] also looking for any missing or endangered children," and that "[o]ne such child could be Anna."  (Id.).

Moreover, "[e]ven if the agents did trick [Hunter] into thinking the investigation was about [Anna], there is no evidence they made any promise that questioning would be limited to that subject, or gave him any assurance that statements relating to other crimes would not be used against him." United States v. Farley, 607 F.3d 1294, 1349 (11th Cir. 2010) (footnote omitted).  Indeed, there is not the slightest hint of evidence of coercive police activity or other aggravating circumstances in this case sufficient to render Hunter's statements involuntary, nor did Agent Westall's reference to Anna somehow "deprive[] [Hunter] of knowledge

essential to his ability to understand the nature of his rights and the consequences of abandoning them." Graham, 2014 WL 2922388, at *9 (citations and internal marks omitted); see also id. at *3 & n.12, *10-12 (citations omitted) (motion to suppress statements denied where agents deliberately used "ruse" of a fictitious "missing girl" to "facilitate [defendant's] cooperation during the interview and to elicit from [defendant] any information he might have about the use of child pornography at [his] house," because the ruse was a "simple misrepresentation of fact" that was not "accompanied by any aggravating circumstances," and did not therefore "r[i]se to the level of 'coercive police activity'").[20]

---

[20] Compare also Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (mother's confession held involuntary where "made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'"); Rogers v. Richmond, 365 U.S. 534 (1961) (confession coerced when police threatened to take suspect's wife into custody if he did not confess); Spano v. New York, 360 U.S. 315, 321-22 (1959) (finding confession involuntary where defendant was foreign-born, had only one-half year of high school education and a history of emotional instability, and was subjected to prolonged late-night questioning that included repeated denials by police of the request to consult with attorney and the threat that if he remained silent his friend on the police force would lose his job); United States v. Alcarez–Mora, 246 F. Supp. 2d 1146, 1154-55 (D. Kan. 2003) (under totality of the circumstances, officer's statement to defendant that if he failed to cooperate he would "never see his daughters again," caused confession to be coerced); Robinson v. Smith, 451 F. Supp. 1278, 1290-93 (W.D.N.Y. 1978) (confession held involuntary where defendant with a fifth-grade education was questioned all night, was not told of his constitutional rights, was misleadingly informed he would benefit by confession, and was presented with a false confession by his accomplice) with Frazier, 394 U.S. at 737-39 (finding statement voluntary despite the fact that police lied to defendant about his co-defendant's statement because the questioning was of short duration and the

In addition, both agents described Hunter's demeanor during the interview as "very cooperative" and "calm," and the recording likewise corroborates Agent Scott's characterization of the agents' discussion with Hunter as a "very calm conversation." (Doc. 21 at 15; Doc. 22 at 17; Gov. Ex. 2). The agents further testified that Hunter seemed to understand the questions that were asked of him and responded appropriately, and that he did not appear to be intoxicated or otherwise mentally impaired. (Doc. 21 at 15; Doc. 22 at 20-21). Neither agent drew his weapon or threatened Hunter at any time, and Hunter clearly stated more than once during the interview that he was speaking with the agents "of [his] own volition." (Doc. 21 at 7, 30; Doc. 22 at 8; Gov. Ex. 2). Furthermore, while Hunter argues that he "felt he had to comply with the agents," [Doc. 25 at 8], because he was "under the

---

defendant was a "mature individual of normal intelligence"); United States v. Anthony, Criminal Case No. 1:11-CR-0326-SCJ-JFK, 2012 WL 684844, at *6 (N.D. Ga. Jan. 20, 2012), adopted by 2012 WL 684802, at *1 (N.D. Ga. Mar. 2, 2012) (statement voluntarily made, notwithstanding police misrepresentations about the reason for the interview, where the atmosphere was cordial, the agents did not use force, draw their weapons, or make any promises or threats, and defendant never told the agents he did not want to speak to them); Martin, 770 F.2d at 925 (finding statement voluntary even though it came after a five-hour interrogation in which one detective raised his voice at the defendant, cursed at him, discussed the death penalty, lied to him by stating a co-defendant had confessed, ignored his request to suspend questioning until the next day, and falsely assured him that the truth could not hurt him); Edwards v. McNeil, No. 3:09-cv-575-J-20JRK, 2011 WL 98407, at *6 (M.D. Fla. Jan. 12, 2011) (citation omitted) (statement voluntary notwithstanding "a certain amount of deception and trickery . . . by the police during the interview" because there were not "'other aggravating circumstances,' like hours of questioning in a hostile environment of an uneducated and mentally unstable or vulnerable defendant").

impression" that he was not "free to do anything" and that "[he] was going to jail that night," (Doc. 21 at 29, 37), the agents plainly told Hunter, at the start of the interview, that he was "not under arrest" and was "not going to jail," and Hunter responded that he understood what the agents had told him, (Gov. Ex. 2).  The agents also explained to Hunter "several times" that he "did not have to talk" to them, and that he "was free to say no[] and . . . [the agents] would leave."  (Doc. 22 at 10); see also (Doc. 21 at 13; Gov. Ex. 2).  Yet at no point during their encounter did Hunter ever indicate that he did not wish to speak to the agents, that he wanted to "stop questioning," or that he wanted the agents to leave.  (Doc. 21 at 15; Doc. 22 at 10).

And although the agents did not inform Hunter that his statements could be used against him, (Doc. 21 at 21; Doc. 22 at 24-25), or ask him if he wanted a lawyer, (Doc. 22 at 24), neither were they required to do so, since, as Hunter concedes, he was "not in custody when he was questioned," and Miranda warnings were therefore not required, [Doc. 25 at 5 n.2].  See also (Gov. Ex. 2 (consent form, reviewed and signed by Hunter prior to questioning, advising Hunter that "anything discovered during th[e] search may be used against [him] in any criminal . . . proceedings")).  Indeed, Hunter was not in physical restraints of any kind during the interview, which took place in his own living room and lasted just half an hour, and he had access to the door and was free to move about the entire time.  (Doc. 21

at 12-13, 15-17, 29; Doc. 22 at 13-14, 16, 19-20, 25, 28-29; Gov. Ex. 2).  In sum, the record simply does not support a finding that Hunter's will was so "overborne" or his "capacity for self-determination" so impaired, as to render his statements involuntary under the Fifth Amendment.  See Martin, 770 F.2d at 926 (citation omitted).[21]  Accordingly, the totality of the evidence in this case demonstrates that Hunter's statements at the interview of May 16, 2013, were the "product of a free and deliberate choice," Moran, 475 U.S. at 421, and it is therefore **RECOMMENDED** that the Hunter's motion to suppress statements, [Doc. 15], be **DENIED**.

---

[21] Hunter also argues that the statements he made following the search of his computer should be suppressed as "fruit of the [allegedly] illegal search." [Doc. 25 at 12]; see also [id. at 8].  Under the doctrine of the "fruit of the poisonous tree," "evidence . . . discovered as a result of an earlier [constitutional] violation is excluded as tainted" in order to discourage future police misconduct.  Missouri v. Seibert, 542 U.S. 600, 612 n.4 (2004).  "[T]ainted fruit can grow only on poisonous trees," however; "that is, . . . derivative evidence may be excluded as tainted only when the court has actually found a prior constitutional violation."  Bruno v. Cunningham, No. 03 Civ. 937(MBM), 2004 WL 2290503, at *12 (S.D.N.Y. Oct. 8, 2004) (citation omitted); see also id. (citing Oregon v. Elstad, 470 U.S. 298, 312 (1985)) ("Absent an underlying wrong, the fruit-of-the-poisonous-tree doctrine simply does not apply.").  The Court has not found evidence of a prior constitutional violation preceding Hunter's statements in this case, but has instead determined that Hunter voluntarily consented to the search of his computer prior to the interview.  Accordingly, Hunter's argument in this regard is without merit, and his motion to suppress his statements as "fruit of the illegal search," [Doc. 25 at 12], is due to be denied.

## III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Hunter's motions to suppress evidence and statements, [Docs. 14 & 15], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 12th day of September, 2014.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE